# EXHIBIT C

**SECURITIES PURCHASE AGREEMENT**

This Securities Purchase Agreement (this "Agreement") is dated as of April 11, 2019, between Avalanche International, Corp., a Nevada corporation (the "Company"), and each purchaser identified on the signature pages hereto (each, including its successors and assigns, a "Purchaser" and collectively, the "Purchasers").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"), and Rule 506 promulgated thereunder, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1     Definitions.   In addition to the terms defined elsewhere in this Agreement: (a) capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Notes (as defined herein), and (b) the following terms have the meanings set forth in this Section 1.1:

"Acquiring Person" shall have the meaning ascribed to such term in Section 4.7.

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which Federal Reserve Bank of New York is closed.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Securities, in each case, have been satisfied or waived.

"Closing Statement" means the Closing Statement in the form on Annex A attached hereto.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, right, option, warrant or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Company Counsel" means Sichenzia Ross Ference LLP.

"Conversion Price" shall have the meaning ascribed to such term in the Notes.

"Conversion Shares" shall have the meaning ascribed to such term in the Notes.

"Disclosure Schedules" shall have the meaning ascribed to such term in Section 3.1.

"Disclosure Time" means, (i) if this Agreement is signed prior to midnight on any Trading Day, 8:00 a.m. (New York City time) on the Trading Day immediately following the date hereof, and (ii) if this Agreement is signed after midnight on any Trading Day, 8:00 a.m. (New York City time) on the date hereof.

"Effective Date" means the earliest of the date that (a) the initial Registration Statement has been declared effective by the Commission, (b) all of the Underlying Shares have been sold pursuant to Rule 144 or may be sold pursuant to Rule 144 without the requirement for the Company to be in compliance with the current public information required under Rule 144 and without volume or manner-of-sale restrictions, (c) following the one year anniversary of the Closing Date provided that a holder of the Underlying Shares is not an Affiliate of the Company or (d) all of the Underlying Shares may be sold pursuant to an exemption from registration under Section 4(a)(1) of the Securities Act without volume or manner-of-sale restrictions and Company Counsel has delivered to such holders a standing written unqualified opinion that resales may then be made by such holders of the Underlying Shares pursuant to such exemption which opinion shall be in form and substance reasonably acceptable to such holders.

"Evaluation Date" shall have the meaning ascribed to such term in Section 3.1(s).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

2

"Exempt Issuance" means the issuance of (a) shares of Common Stock or options to employees, officers, service providers such as attorneys or bona-fide independent contractors of the Company, or directors of the Company pursuant to any stock or option plan duly adopted for such purpose, by a majority of the non-employee members of the Board of Directors or a majority of the members of a committee of non-employee directors established for such purpose for services rendered to the Company, or approved by a majority of shareholders of the Company, (b) securities upon the exercise or exchange of or conversion of any Securities issued hereunder and/or other securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date of this Agreement, provided that such securities have not been amended since the date of this Agreement to increase the number of such securities or to decrease the exercise price, exchange price or conversion price of such securities (other than in connection with stock splits or combinations) or to extend the term of such securities, (c) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors of the Company, provided that such securities are issued as "restricted securities" (as defined in Rule 144) and carry no registration rights that require or permit the filing of any registration statement in connection therewith during the prohibition period in Section 4.13(a) herein, and provided that any such issuance shall only be to a Person (or to the equityholders of a Person) which is, itself or through its subsidiaries, an operating company or an owner of an asset in a business synergistic with, or complementary to, the business of the Company and shall provide to the Company additional benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Guarantee" means the Guaranty, dated the date hereof, by each Subsidiary in favor of the Purchasers, in the form of Exhibit F attached hereto.

"Indebtedness" shall have the meaning ascribed to such term in Section 3.1(bb).

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(o).

"Intercreditor Agreement" shall mean the Intercreditor Agreement, dated on or about the date hereof, by and among the Company, the Collateral Agent (as defined therein), the Second Lien Collateral Agent (as defined therein), the Third Lien Collateral Agent (as defined therein) and the Purchasers.

"Legend Removal Date" shall have the meaning ascribed to such term in Section 4.1(c).

3

"Liens" means a lien, charge, pledge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Lock-up" shall have the meaning ascribed to such term in Section 2.2(a)(viii).

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

"Material Permits" shall have the meaning ascribed to such term in Section 3.1(m).

"Maximum Rate" shall have the meaning ascribed to such term in Section 5.17.

"Notes" means the 10% Senior Secured Convertible Promissory Notes due, subject to the terms therein, twelve (12) months from their date of issuance, issued by the Company to the Purchasers hereunder, in the form of Exhibit A attached hereto.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Pledged Securities" means any and all certificates and other instruments representing or evidencing all of the capital stock and other equity interests of Restaurant Capital Group, LLC, a Subsidiary.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Public Information Failure" shall have the meaning ascribed to such term in Section 4.3(b).

"Public Information Failure Payments" shall have the meaning ascribed to such term in Section 4.3(b).

"Purchaser Party" shall have the meaning ascribed to such term in Section 4.10.

"RB" means Robinson Brog Leinwand Greene Genovese & Gluck PC.

"Registration Rights Agreement" means the Registration Rights Agreement, dated on or about the date hereof, among the Company and the Purchasers, in the form of Exhibit B attached hereto.

"Registration Statement" means a registration statement meeting the requirements set forth in the Registration Rights Agreement and covering the resale of the Underlying Shares by each Purchaser as provided for in the Registration Rights Agreement.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Required Minimum" means, as of any date, 200% of the maximum aggregate number of shares of Common Stock then issued or potentially issuable in the future pursuant to the Transaction Documents, including any Underlying Shares issuable upon exercise in full of all Warrants or conversion in full of all Notes (including Underlying Shares issuable as payment of interest on the Notes), ignoring any conversion or exercise limits set forth therein, and assuming that the Conversion Price is at all times on and after the date of determination 50% of the then Conversion Price on the Trading Day immediately prior to the date of determination; provided, however, the Purchasers and the Company agree that initially, the Required Minimum shall be 10,352,941 shares of Common Stock to cover the Underlying Shares.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"SEC Reports" shall have the meaning ascribed to such term in Section 3.1(h).

"Securities" means the Notes, the Warrants and the Underlying Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" means the Security Agreement, dated the date hereof, among the Company and the Purchasers, in the form of Exhibit E attached hereto.

"Security Documents" shall mean the Security Agreement, the Intercreditor Agreement, the Guaranty, the original Pledged Securities, along with notarized executed blank stock powers to the Pledged Securities, and any other documents and filing required thereunder in order to grant the Purchasers a first priority security interest in the assets of the Company and the Subsidiaries as provided in the Security Agreement, including all UCC-1 filing receipts.

"Short Sales" means all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall not be deemed to include locating and/or borrowing shares of Common Stock).

"Subscription Amount" means, as to each Purchaser, the aggregate amount to be paid for Notes and Warrants purchased hereunder as specified below such Purchaser's name on the signature page of this Agreement and next to the heading "Subscription Amount," in United States dollars and in immediately available funds.

"Subsidiary" means any subsidiary of the Company as set forth on Schedule 3.1(a) and shall, where applicable, also include any direct or indirect subsidiary of the Company formed or acquired after the date hereof.

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, or the New York Stock Exchange (or any successors to any of the foregoing).

"Transaction Documents" means this Agreement, the Notes, the Warrants, the Lock-up, the Registration Rights Agreement, the Security Agreement, the Intercreditor Agreement, the Guaranty, all exhibits and schedules thereto and hereto and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Transfer Agent" means Transfer Online, and any successor transfer agent of the Company.

"Underlying Shares" means the Warrant Shares and shares of Common Stock issued and issuable pursuant to the terms of the Note, including without limitation, shares of Common Stock issued and issuable in lieu of the cash payment of interest on the Notes in accordance with the terms of the Notes, in each case without respect to any limitation or restriction on the conversion of the Notes or the exercise of the Warrants.

"Variable Rate Transaction" shall have the meaning ascribed to such term in Section 4.13(b).

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), (b) if OTCQB or OTCQX is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on OTCQB or OTCQX as applicable, (c) if the Common Stock is not then listed or quoted for trading on OTCQB or OTCQX and if prices for the Common Stock are then reported in the "Pink Sheets" published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices), the most

6

recent bid price per share of the Common Stock so reported, or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Purchasers of a majority in interest of the Securities then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Purchasers at the Closing in accordance with Section 2.2(a) hereof, which Warrants shall be exercisable immediately following their issuance and have a term of exercise equal to five (5) years, in the form of Exhibit C attached hereto.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

## ARTICLE II.
## PURCHASE AND SALE

2.1     Closing.  On the Closing Date, upon the terms and subject to the conditions set forth herein, substantially concurrent with the execution and delivery of this Agreement by the parties hereto, the Company agrees to sell, and the Purchasers, severally and not jointly, agree to purchase, up to an aggregate of $2,750,000 in principal amount of the Notes.  Each Purchaser shall deliver to the Company, via wire transfer or a certified check, immediately available funds equal to such Purchaser's Subscription Amount as set forth on the signature page hereto executed by such Purchaser, and the Company shall deliver to each Purchaser its respective Note and a Warrant, as determined pursuant to Section 2.2(a), and the Company and each Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing.  Upon satisfaction of the covenants and conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of RB or such other location as the parties shall mutually agree.

2.2     Deliveries.

(a)     On or prior to the Closing Date, the Company shall deliver or cause to be delivered to each Purchaser the following:

(i)     this Agreement duly executed by the Company;

(ii)     a legal opinion of Company Counsel, substantially in the form of Exhibit D attached hereto;

(iii)     a Note with a principal amount equal to such Purchaser's Subscription Amount, registered in the name of such Purchaser equal to the amount set forth opposite such Purchaser's name in column (2) on the Schedule of Purchasers;

(iv)     a Warrant registered in the name of such Purchaser to purchase up to a number of shares of Common Stock equal to 50% of such Purchaser's Conversion Shares on the Closing Date, and recorded on column (3) of the

7

Schedule of Purchasers with an exercise price equal to $0.85, subject to adjustment therein;

(v)      the Company shall have provided each Purchaser with the Company's wire instructions, on Company letterhead and executed by the Chief Executive Officer or Chief Financial Officer

(vi)      the Security Agreement, duly executed by the Company and each Subsidiary, along with all of the Security Documents, including the Intercreditor Agreement and the Guaranty, each duly executed by the respective parties thereto, the original Pledged Securities and corresponding stock powers;

(vii)      the lock-up agreements from all officers, directors, and 5% or greater shareholders in a form of Exhibit G hereto (the "Lock-up"); and

(viii)      the Registration Rights Agreement duly executed by the Company.

(b)      On or prior to the Closing Date, each Purchaser shall deliver or cause to be delivered to the Company the following:

(i)      this Agreement duly executed by such Purchaser;

(ii)      such Purchaser's Subscription Amount by wire transfer to the account specified in writing by the Company; and

(iii)      the Security Agreement duly executed by such Purchaser; and

(iv)      the Registration Rights Agreement duly executed by such Purchaser.

(c)      Within (i) ten (10) days following the Closing Date, the Company shall deliver to each Purchaser the unaudited financial statements of the Company, and the unaudited balance sheet of Ault & Company, Inc., each as of the fiscal year ended December 31, 2018 and (ii) twenty-one (21) days following the Closing Date, the Company shall ensure the perfection of the Purchasers' security interest in MTIX Limited, a company formed under the laws of England and Wales.

2.3      Closing Conditions.

(a)      The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

(i)      the accuracy in all material respects on (or, to the extent representations or warranties are qualified by materiality or Material Adverse Effect, in all respects) the Closing Date of the representations and warranties of the Purchasers contained herein (unless as of a specific date therein in which case they shall be accurate as of such date);

8

(ii)     all obligations, covenants and agreements of each Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)    the delivery by each Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b)     The respective obligations of the Purchasers hereunder in connection with the Closing are subject to the following conditions being met:

(i)     the accuracy in all material respects (or, to the extent representations or warranties are qualified by materiality or Material Adverse Effect, in all respects) when made and on the Closing Date of the representations and warranties of the Company contained herein (unless as of a specific date therein in which case they shall be accurate as of such date);

(ii)    all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

(iii)   the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)    there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)     from the date hereof to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission  or the Company's principal Trading Market and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of such Purchaser, makes it impracticable or inadvisable to purchase the Securities at the Closing.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

3.1    Representations and Warranties of the Company.  Except as set forth in the Disclosure Schedules, which Disclosure Schedules shall be deemed a part hereof and shall qualify any representation or otherwise made herein to the extent of the disclosure contained in the corresponding section of the Disclosure Schedules, the Company hereby makes the following representations and warranties to each Purchaser:

(a)      <u>Subsidiaries</u>.  All of the direct and indirect subsidiaries of the Company are set forth on <u>Schedule 3.1(a)</u>.  Except as set forth on <u>Schedule 3.1(a), the</u> Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all of the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.  If the Company has no subsidiaries, all other references to the Subsidiaries or any of them in the Transaction Documents shall be disregarded.

(b)      <u>Organization and Qualification</u>.  The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted.  Neither the Company nor any Subsidiary is in violation nor default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents.  Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in: (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business, prospects or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "<u>Material Adverse Effect</u>") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)      <u>Authorization; Enforcement</u>.

(i)      The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by this Agreement and each of the other Transaction Documents and otherwise to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each of the other Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, the Board of Directors or the Company's stockholders in connection herewith or therewith other than in connection with the Required Approvals.  This Agreement and each other Transaction Document to which it is a party has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by

laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(ii)     With respect to the Guaranty, each of the Subsidiaries has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by such agreement and otherwise to carry out its obligations thereunder.  The execution and delivery of the Guaranty and the consummation by the Company of the transactions contemplated thereby have been duly authorized by all necessary action on the part of the Company, and no further action is required by the respective Subsidiary, its managers or its members in connection therewith. The Guaranty has been (or upon delivery will have been) duly executed by the respective Subsidiaries and, when delivered in accordance with the terms thereof, will constitute the valid and binding obligation of the respective Subsidiary enforceable against such Subsidiary in accordance with its terms, except (A) as limited by general equitable principals and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (B) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (C) insofar as indemnification and contribution provisions may be limited by applicable law.

(d)     No Conflicts.  The execution, delivery and performance by the Company of this Agreement and the other Transaction Documents to which it is a party, the issuance and sale of the Securities and the consummation by it of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

(e)     Filings, Consents and Approvals.  The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than: (i) the filings required pursuant to Section 4.6 of this Agreement, (ii) the filing with the Commission pursuant to the Registration Rights

Agreement, and (iii) the filing of Form D with the Commission and such filings as are required to be made under applicable state securities laws (collectively, the "Required Approvals").

(f)   <u>Issuance of the Securities</u>.  The Securities are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents. The Underlying Shares, when issued in accordance with the terms of the Transaction Documents, will be validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents.  The Company has reserved from its duly authorized capital stock a number of shares of Common Stock for issuance of the Underlying Shares at least equal to the Required Minimum on the date hereof.

(g)   <u>Capitalization</u>.  The capitalization of the Company as of the date hereof is as set forth on <u>Schedule 3.1(g)</u>, which <u>Schedule 3.1(g)</u> shall also include the number of shares of Common Stock owned beneficially, and of record, by Affiliates of the Company as of the date hereof. No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents.  Except as set forth on <u>Schedule 3.1(g)</u>, or as a result of the purchase and sale of the Securities, there are no outstanding options, warrants, scrip rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire any shares of Common Stock or the capital stock of any Subsidiary, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents or capital stock of any Subsidiary. The issuance and sale of the Securities will not obligate the Company or any Subsidiary to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. There are no outstanding securities or instruments of the Company or any Subsidiary that contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to redeem a security of the Company or such Subsidiary. The Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement. All of the outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities.  No further approval or authorization of any stockholder, the Board of Directors or others is required for the issuance and sale of the Securities.  There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

(h)     Reserved.

(i)     Material Changes; Undisclosed Events, Liabilities or Developments.  Since the date of the latest audited financial statements included within the SEC Reports, except as set forth on Schedule 3.1(i), (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. The Company does not have pending before the Commission any request for confidential treatment of information. Except for the issuance of the Securities contemplated by this Agreement or as set forth on Schedule 3.1(i), no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its Subsidiaries or their respective businesses, prospects, properties, operations, assets or financial condition, that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed made that has not been publicly disclosed at least 1 Trading Day prior to the date that this representation is made.

(j)     Litigation.  There is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect.  Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.  There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company.  The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(k)     Labor Relations.  No labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company, which could reasonably be expected to result in a Material Adverse Effect.  None of the Company's or its Subsidiaries' employees is a member of a union that relates to such employee's

relationship with the Company or such Subsidiary, and neither the Company nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relationships with their employees are good.  To the knowledge of the Company, no executive officer of the Company or any Subsidiary, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any third party, and the continued employment of each such executive officer does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters.  The Company and its Subsidiaries are in compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours, except where the failure to be in compliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(l)     Compliance.  Neither the Company nor any Subsidiary: (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any judgment, decree or order of any court, arbitrator or other governmental authority or (iii) is or has been in violation of any statute, rule, ordinance or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters, except in each case as could not have or reasonably be expected to result in a Material Adverse Effect.

(m)     Environmental Laws.  The Company and its Subsidiaries (i) are in compliance with all federal, state, local and foreign laws relating to pollution or protection of human health or the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), including laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands, or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations, issued, entered, promulgated or approved thereunder ("Environmental Laws"); (ii) have received all permits licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses; and (iii) are in compliance with all terms and conditions of any such permit, license or approval where in each clause (i), (ii) and (iii), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

14

(n)     Regulatory Permits.   The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses, except where the failure to possess such permits could not reasonably be expected to result in a Material Adverse Effect ("Material Permits"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

(o)     Title to Assets.   Except as set forth on Schedule 3.1(o), the Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them and good and marketable title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for (i) Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and (ii) Liens for the payment of federal, state or other taxes, for which appropriate reserves have been made therefor in accordance with GAAP and, the payment of which is neither delinquent nor subject to penalties.   Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

(p)     Intellectual Property.   The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights necessary or required for use in connection with their respective businesses and which the failure to so have could have a Material Adverse Effect (collectively, the "Intellectual Property Rights").   None of, and neither the Company nor any Subsidiary has received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within two (2) years from the date of this Agreement.   Neither the Company nor any Subsidiary has received, since the date of the latest audited financial statements included within the SEC Reports, a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person, except as could not have or reasonably be expected to not have a Material Adverse Effect.   To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights.   The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties, except where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(q)     Insurance.   The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance coverage at least equal to the aggregate Subscription Amount.   Neither the Company nor any Subsidiary has

any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(r)     <u>Transactions with Affiliates and Employees</u>.  Except as set forth on <u>Schedule 3.1(r)</u>, none of the officers or directors of the Company or any Subsidiary and, to the knowledge of the Company, none of the employees of the Company or any Subsidiary is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from providing for the borrowing of money from or lending of money to, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee, stockholder, member or partner, in each case in excess of $120,000 other than for (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock option agreements under any stock option plan of the Company.

(s)     <u>Reserved</u>.

(t)     <u>Certain Fees</u>.  There are no brokerage or finder's fees or commissions are or will be payable by the Company or any Subsidiaries to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.  Except as provided in this Section 3.1(t), the Purchasers shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(u)     <u>Private Placement</u>.     Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, no registration under the Securities Act is required for the offer and sale of the Securities by the Company to the Purchasers as contemplated hereby.  The issuance and sale of the Securities hereunder does not contravene the rules and regulations of the Trading Market.

(v)     <u>Investment Company</u>. The Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Securities, will not be or be an Affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.  The Company shall conduct its business in a manner so that it will not become an "investment company" subject to registration under the Investment Company Act of 1940, as amended.

(w)     <u>Registration Rights</u>.  Except as set forth on <u>Schedule 3.1(w) and other</u> than each of the Purchasers, no Person has any right to cause the Company or any Subsidiary to

effect the registration under the Securities Act of any securities of the Company or any Subsidiaries.

(x)     Reserved.

(y)     Application of Takeover Protections.  The Company and the Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's articles of incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(z)     Disclosure.  Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information.  The Company understands and confirms that the Purchasers will rely on the foregoing representation in effecting transactions in securities of the Company.  All of the disclosure furnished by or on behalf of the Company to the Purchasers regarding the Company and its Subsidiaries, their respective businesses and the transactions contemplated hereby, including the Disclosure Schedules to this Agreement, is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.   The press releases disseminated by the Company during the twelve months preceding the date of this Agreement taken as a whole do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made and when made, not misleading.  The Company acknowledges and agrees that no Purchaser makes or has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 3.2 hereof.

(aa)    No Integrated Offering.  Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, neither the Company, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of (i) the Securities Act which would require the registration of any such securities under the Securities Act, or (ii) any applicable shareholder approval provisions of any Trading Market on which any of the securities of the Company are listed or designated.

(bb)    Solvency.  Based on the consolidated financial condition of the Company

17

as of the Closing Date, after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder, (i) the fair saleable value of the Company's assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature, (ii) the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, consolidated and projected capital requirements and capital availability thereof, and (iii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid.  The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt). The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one year from the Closing Date.  Schedule 3.1(bb) sets forth as of the date hereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments.  For the purposes of this Agreement, "Indebtedness" means (x) any liabilities for borrowed money or amounts owed in excess of $50,000 (other than trade accounts payable incurred in the ordinary course of business), (y) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's consolidated balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (z) the present value of any lease payments in excess of $50,000 due under leases required to be capitalized in accordance with GAAP.  Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(cc)     Tax Status.     Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and its Subsidiaries each (i) has made or filed all United States federal, state and local income and all foreign income and franchise tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations and (iii) has set aside on its books provision reasonably adequate for the payment of all material taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company or of any Subsidiary know of no basis for any such claim.

(dd)     No General Solicitation. Neither the Company nor any Person acting on behalf of the Company has offered or sold any of the Securities by any form of general solicitation or general advertising.  The Company has offered the Securities for sale only to the Purchasers and certain other "accredited investors" within the meaning of Rule 501 under the Securities Act.

(ee)     Foreign Corrupt Practices.  Neither the Company nor any Subsidiary, nor to the knowledge of the Company or any Subsidiary, any agent or other person acting on behalf of the Company or any Subsidiary, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company or any Subsidiary (or made by any person acting on its behalf of which the Company is aware) which is  in violation of law or (iv) violated in any material respect any provision of FCPA.

(ff)     Accountants.  The Company's accounting firm is set forth on Schedule 3.1(ff) of the Disclosure Schedules.  To the knowledge and belief of the Company, such accounting firm (i) is a registered public accounting firm as required by the Exchange Act and (ii) shall express its opinion with respect to the financial statements to be included in the Company's Annual Report for the fiscal year ending November 30, 2018.

(gg)     Seniority.  As of the Closing Date, no Indebtedness or other claim against the Company is senior to the Notes in right of payment, whether with respect to interest or upon liquidation or dissolution, or otherwise, other than indebtedness secured by purchase money security interests (which is senior only as to underlying assets covered thereby) and capital lease obligations (which is senior only as to the property covered thereby).

(hh)     No Disagreements with Accountants and Lawyers.   There are no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company and the Company is current with respect to any fees owed to its accountants and lawyers which could affect the Company's ability to perform any of its obligations under any of the Transaction Documents.

(ii)     Acknowledgment Regarding Purchasers' Purchase of Securities.   The Company acknowledges and agrees that each of the Purchasers is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated thereby.  The Company further acknowledges that no Purchaser is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated thereby and any advice given by any Purchaser or any of their respective representatives or agents in connection with the Transaction Documents and the transactions contemplated thereby is merely incidental to the Purchasers' purchase of the Securities.  The Company further represents to each Purchaser that the Company's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation of the transactions contemplated hereby by the Company and its representatives.

(jj)     Acknowledgment Regarding Purchaser's Trading Activity.  Anything in this Agreement or elsewhere herein to the contrary notwithstanding (except for Sections 3.2(f) and 4.15 hereof), it is understood and acknowledged by the Company that: (i) none

of the Purchasers has been asked by the Company to agree, nor has any Purchaser agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term, (ii) past or future open market or other transactions by any Purchaser, specifically including, without limitation, Short Sales or "derivative" transactions, before or after the closing of this or future private placement transactions, may negatively impact the market price of the Company's publicly-traded securities, (iii) any Purchaser, and counter-parties in "derivative" transactions to which any such Purchaser is a party, directly or indirectly, may presently have a "short" position in the Common Stock and (iv) each Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that (y) one or more Purchasers may engage in hedging activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Underlying Shares deliverable with respect to Securities are being determined, and (z) such hedging activities (if any) could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging activities are being conducted. The Company acknowledges that such aforementioned hedging activities do not constitute a breach of any of the Transaction Documents.

(kk)     Regulation M Compliance.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company.

(ll)     [Reserved].

(mm)     Stock Option Plans. Each stock option granted by the Company under the Company's stock option plan was granted (i) in accordance with the terms of the Company's stock option plan and (ii) with an exercise price at least equal to the fair market value of the Common Stock on the date such stock option would be considered granted under GAAP and applicable law. No stock option granted under the Company's stock option plan has been backdated. The Company has not knowingly granted, and there is no and has been no Company policy or practice to knowingly grant, stock options prior to, or otherwise knowingly coordinate the grant of stock options with, the release or other public announcement of material information regarding the Company or its Subsidiaries or their financial results or prospects.

(nn)     Office of Foreign Assets Control.  Neither the Company nor any Subsidiary nor, to the Company's knowledge, any director, officer, agent, employee or affiliate of the Company or any Subsidiary is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(oo)   U.S. Real Property Holding Corporation.   The Company is not and has never been a U.S. real property holding corporation within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended, and the Company shall so certify upon Purchaser's request.

(pp)   Bank Holding Company Act.   Neither the Company nor any of its Subsidiaries or Affiliates is subject to the Bank Holding Company Act of 1956, as amended (the "BHCA") and to regulation by the Board of Governors of the Federal Reserve System (the "Federal Reserve").  Neither the Company nor any of its Subsidiaries or Affiliates owns or controls, directly or indirectly, five percent (5%) or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.  Neither the Company nor any of its Subsidiaries or Affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

(qq)   Money Laundering.   The operations of the Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial record-keeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, applicable money laundering statutes and applicable rules and regulations thereunder (collectively, the "Money Laundering Laws"), and no Action or Proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any Subsidiary with respect to the Money Laundering Laws is pending or, to the knowledge of the Company or any Subsidiary, threatened.

(rr)   No Disqualification Events.   With respect to the Securities to be offered and sold hereunder in reliance on Rule 506 under the Securities Act, none of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the offering hereunder, any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the Securities Act) connected with the Company in any capacity at the time of sale (each, an "Issuer Covered Person" and, together, "Issuer Covered Persons") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3). The Company has exercised reasonable care to determine whether any Issuer Covered Person is subject to a Disqualification Event. The Company has complied, to the extent applicable, with its disclosure obligations under Rule 506(e), and has furnished to the Purchasers a copy of any disclosures provided thereunder.

(ss)   Other Covered Persons. The Company is not aware of any person (other than any Issuer Covered Person) that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of any Securities.

(tt)   Notice of Disqualification Events. The Company will notify the Purchasers in writing, prior to the Closing Date of (i) any Disqualification Event relating to any Issuer

Covered Person and (ii) any event that would, with the passage of time, become a Disqualification Event relating to any Issuer Covered Person.

(uu)    Promotional Stock Activities.    Neither the Company, its officers, its directors, nor any affiliates or agents of the Company have engaged in any stock promotional activity that could give rise to a complaint, inquiry, or trading suspension by the Securities and Exchange Commission alleging (i) a violation of the anti-fraud provisions of the federal securities laws, (ii) violations of the anti-touting provisions, (iii) improper "gun-jumping; or (iv) promotion without proper disclosure of compensation.

(vv)    Payments of Cash.    Except as disclosed on Schedule 3.1(vv), neither the Company, its officers, or any affiliates or agents of the Company have withdrawn or paid cash (not including a check or other similar negotiable instrument) to any vendor in an aggregate amount that exceeds Five Thousand Dollars ($5,000) for any purpose.

3.2    Representations and Warranties of the Purchasers.    Each Purchaser, for itself and for no other Purchaser, hereby represents and warrants as of the date hereof and as of the Closing Date to the Company as follows (unless as of a specific date therein, in which case they shall be accurate as of such date):

(a)    Organization; Authority.  Such Purchaser is either an individual or an entity duly incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation with full right, corporate, partnership, limited liability company or similar power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of the Transaction Documents and performance by such Purchaser of the transactions contemplated by the Transaction Documents have been duly authorized by all necessary corporate, partnership, limited liability company or similar action, as applicable, on the part of such Purchaser. Each Transaction Document to which it is a party has been duly executed by such Purchaser, and when delivered by such Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Purchaser, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b)    Own Account.    Such Purchaser understands that the Securities are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or

22

understandings with any other persons to distribute or regarding the distribution of such Securities in violation of the Securities Act or any applicable state securities law (this representation and warranty not limiting such Purchaser's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws). Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c)     Purchaser Status. At the time such Purchaser was offered the Securities, it was, and as of the date hereof it is, and on each date on which it exercises any Warrants or converts any Notes it will be an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act.

(d)     Experience of Such Purchaser. Such Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(e)     General Solicitation. Such Purchaser is not, to such Purchaser's knowledge, purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or, to the knowledge of such Purchaser, any other general solicitation or general advertisement.

(f)     Certain Transactions and Confidentiality. Other than consummating the transactions contemplated hereunder, such Purchaser has not, nor has any Person acting on behalf of or pursuant to any understanding with such Purchaser, directly or indirectly executed any purchases or sales, including Short Sales, of the securities of the Company during the period commencing as of the time that such Purchaser first received a term sheet (written or oral) from the Company or any other Person representing the Company setting forth the material terms of the transactions contemplated hereunder and ending immediately prior to the execution hereof. The Purchaser covenants and agrees that neither it, nor any Affiliate acting on its behalf or pursuant to any understanding with it will execute any Short Sales (as such term is defined in Rule 200 of Regulation SHO of the Exchange Act) of the Common Stock or hedging transaction, which establishes a net short position with respect to the Company's Common Stock during the period commencing with the execution of this Agreement and ending on the earlier Maturity Date (as defined in the Notes) of the Notes or the full repayment or conversion of the Notes; provided that this provision shall not prohibit any sales made where a corresponding Notice of Conversion is tendered to the Company and the shares received upon such conversion or exercise are used to close out such sale (a "Prohibited Short Sale"); provided, further that this provision shall not operate to restrict a Purchaser's trading under any prior securities purchase agreement containing contractual rights that explicitly protects such trading in respect of the previously issued securities.

## ARTICLE IV.
## OTHER AGREEMENTS OF THE PARTIES

4.1    Transfer Restrictions.

(a)    The Securities may only be disposed of in compliance with state and federal securities laws.  In connection with any transfer of Securities other than pursuant to an effective registration statement or Rule 144, to the Company or to an Affiliate of a Purchaser or in connection with a pledge as contemplated in Section 4.1(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act. As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and the Registration Rights Agreement and shall have the rights and obligations of a Purchaser under this Agreement and the Registration Rights Agreement.

(b)    The Purchasers agree to the imprinting, so long as is required by this Section 4.1, of a legend on any of the Securities in the following form:

[NEITHER] THIS SECURITY [NOR THE SECURITIES INTO WHICH THIS SECURITY IS [EXERCISABLE] [CONVERTIBLE]] HAS [NOT] BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.  THIS SECURITY [AND THE SECURITIES ISSUABLE UPON [EXERCISE] [CONVERSION] OF THIS SECURITY] MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The Company acknowledges and agrees that a Purchaser may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Securities to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and, if required under the terms of such arrangement, such Purchaser may transfer pledged or secured Securities to the pledgees or secured parties.  Such a pledge or transfer would not be subject to approval of the Company and no legal opinion of legal counsel of the pledgee, secured

party or pledgor shall be required in connection therewith. Further, no notice shall be required of such pledge. At the appropriate Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities, including, if the Securities are subject to registration pursuant to the Registration Rights Agreement, the preparation and filing of any required prospectus supplement under Rule 424(b)(3) under the Securities Act or other applicable provision of the Securities Act to appropriately amend the list of Selling Stockholders (as defined in the Registration Rights Agreement) thereunder.

(c)     Certificates evidencing the Underlying Shares shall not contain any legend (including the legend set forth in Section 4.1(b) hereof): (i) while a registration statement (including the Registration Statement) covering the resale of such security is effective under the Securities Act, (ii) following any sale of such Underlying Shares pursuant to Rule 144 (assuming cashless exercise of the Warrants), (iii) if such Underlying Shares are eligible for sale under Rule 144 (assuming cashless exercise of the Warrants) or (iv) if such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission). The Company shall cause its counsel to issue a legal opinion to the Transfer Agent or the Purchaser promptly if required by the Transfer Agent to effect the removal of the legend hereunder, or if requested by a Purchaser, respectively. If all or any portion of a Note is converted or Warrant is exercised at a time when there is an effective registration statement to cover the resale of the Underlying Shares, or if such Underlying Shares may be sold under Rule 144  without the requirement for the Company to be in compliance with the current public information required under Rule 144 (assuming cashless exercise of the Warrants) as to such Underlying Shares and without volume or manner-of-sale restrictions or if such legend is not otherwise required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission) then such Underlying Shares shall be issued free of all legends.  The Company agrees that following such time as such legend is no longer required under this Section 4.1(c), it will, no later than the earlier of (i) two (2) Trading Days and (ii) the number of Trading Days comprising the Standard Settlement Period (as defined below) following the delivery by a Purchaser to the Company or the Transfer Agent of a certificate representing Underlying Shares, as applicable, issued with a restrictive legend (such date, the "Legend Removal Date"), deliver or cause to be delivered to such Purchaser a certificate representing such shares that is free from all restrictive and other legends; *provided that* the Purchaser shall have previously delivered to the Company all documents required by the Company's Transfer Agent and/or Counsel to deliver Shares that are free of restrictive legends. The Company may not make any notation on its records or give instructions to the Transfer Agent that enlarge the restrictions on transfer set forth in this Section 4. Certificates for Underlying Shares subject to legend removal hereunder shall be transmitted by the Transfer Agent to the Purchaser by crediting the account of the Purchaser's prime broker with the Depository Trust Company System as directed by such Purchaser. As used herein, "Standard Settlement Period" means the standard settlement period, expressed in a number of Trading Days, on the Company's primary Trading Market

with respect to the Common Stock as in effect on the date of delivery of a certificate representing Underlying Shares, as applicable, issued with a restrictive legend.

(d)      In addition to such Purchaser's other available remedies, the Company shall pay to a Purchaser, in cash, (i) as partial liquidated damages and not as a penalty, for each $1,000 of Underlying Shares (based on the VWAP of the Common Stock on the date such Securities are submitted to the Transfer Agent) delivered for removal of the restrictive legend and subject to Section 4.1(c), $10 per Trading Day (increasing to $20 per Trading Day five (5) Trading Days after such damages have begun to accrue) for each Trading Day after the Legend Removal Date until such certificate is delivered without a legend and (ii) if the Company fails to (a) issue and deliver (or cause to be delivered) to a Purchaser by the Legend Removal Date a certificate representing the Securities so delivered to the Company by such Purchaser that is free from all restrictive and other legends and (b) if after the Legend Removal Date such Purchaser purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by such Purchaser of all or any portion of the number of shares of Common Stock, or a sale of a number of shares of Common Stock equal to all or any portion of the number of shares of Common Stock that such Purchaser anticipated receiving from the Company without any restrictive legend, then, an amount equal to the excess of such Purchaser's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (including brokerage commissions and other out-of-pocket expenses, if any) (the "Buy-In Price") over the product of (A) such number of Underlying Shares that the Company was required to deliver to such Purchaser by the Legend Removal Date multiplied by (B) the lowest closing sale price of the Common Stock on any Trading Day during the period commencing on the date of the delivery by such Purchaser to the Company of the applicable Underlying Shares (as the case may be) and ending on the date of such delivery and payment under this clause (ii).

(e)      Each Purchaser, severally and not jointly with the other Purchasers, agrees with the Company that such Purchaser will sell any Securities pursuant to either the registration requirements of the Securities Act, including any applicable prospectus delivery requirements, or an exemption therefrom, and that if Securities are sold pursuant to a Registration Statement, they will be sold in compliance with the plan of distribution set forth therein, and acknowledges that the removal of the restrictive legend from certificates representing Securities as set forth in this Section 4.1 is predicated upon the Company's reliance upon this understanding.

4.2      Reserved.

4.3      Furnishing of Information; Public Information.

(a)      Following the effectiveness of the registration statement registering the Issuable Shares for resale pursuant to the Registration Rights Agreement and until the earliest of the time that (i) no Purchaser owns Securities or (ii) the Warrants have expired, the Company covenants to maintain the registration of the Common Stock under Section 12(b) or 12(g) of the Exchange Act and to timely file (or obtain extensions in respect

thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act even if the Company is not then subject to the reporting requirements of the Exchange Act.

(b)      At any time during the period commencing from the six (6) month anniversary of the date hereof and ending at such time that all of the Securities may be sold without the requirement for the Company to be in compliance with Rule 144(c)(1) and otherwise without restriction or limitation pursuant to Rule 144, if the Company (i) shall fail for any reason to satisfy the current public information requirement under Rule 144(c) or (ii) has ever been an issuer described in Rule 144 (i)(1)(i) or becomes an issuer in the future, and the Company shall fail to satisfy any condition set forth in Rule 144(i)(2) (a "Public Information Failure") then, in addition to such Purchaser's other available remedies, the Company shall pay to a Purchaser, in cash, as partial liquidated damages and not as a penalty, by reason of any such delay in or reduction of its ability to sell the Securities, an amount in cash equal to two percent (2.0%) of the aggregate Subscription Amount of such Purchaser's Securities on the day of a Public Information Failure and on every thirtieth (30th) day (pro-rated for periods totaling less than thirty days) thereafter until the earlier of (a) the date such Public Information Failure is cured and (b) such time that such public information is no longer required for the Purchasers to transfer the Underlying Shares pursuant to Rule 144.  The payments to which a Purchaser shall be entitled pursuant to this Section 4.3(b) are referred to herein as "Public Information Failure Payments."  Public Information Failure Payments shall be paid on the earlier of (i) the last day of the calendar month during which such Public Information Failure Payments are incurred and (ii) the third (3rd) Business Day after the event or failure giving rise to the Public Information Failure Payments is cured.  In the event the Company fails to make Public Information Failure Payments in a timely manner, such Public Information Failure Payments shall bear interest at the rate of 1.5% per month (prorated for partial months) until paid in full. Nothing herein shall limit such Purchaser's right to pursue actual damages for the Public Information Failure, and such Purchaser shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.

4.4      Integration.  The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the Securities Act of the sale of the Securities or that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

4.5      Conversion and Exercise Procedures.  Each of the form of Notice of Exercise included in the Warrants and the form of Notice of Conversion included in the Notes set forth the totality of the procedures required of the Purchasers in order to exercise the Warrants or convert the Notes.  Without limiting the preceding sentences, no ink-original Notice of Exercise or Notice of Conversion shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Notice of Exercise or Notice of Conversion form be required in order to

exercise the Warrants or convert the Notes.  No additional legal opinion, other information or instructions shall be required of the Purchasers to exercise their Warrants or convert their Notes. The Company shall honor exercises of the Warrants and conversions of the Notes and shall deliver Underlying Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents.

4.6     Securities Laws Disclosure; Publicity.  The Company shall file a Current Report on Form 8-K, including the Transaction Documents as exhibits thereto, with the Commission within the time required by the Exchange Act.  From and after the issuance of such press release, the Company represents to the Purchasers that it shall have publicly disclosed all material, non-public information delivered to any of the Purchasers by the Company or any of its Subsidiaries, or any of their respective officers, directors, employees or agents in connection with the transactions contemplated by the Transaction Documents. In addition, effective upon the issuance of such press release, the Company acknowledges and agrees that any and all confidentiality or similar obligations under any agreement, whether written or oral, between the Company, any of its Subsidiaries or any of their respective officers, directors, agents, employees or Affiliates on the one hand, and any of the Purchasers or any of their Affiliates on the other hand, shall terminate. The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release nor otherwise make any such public statement without the prior consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of each Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication.  Notwithstanding the foregoing, the Company shall not publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of such Purchaser, except (a) as required by federal securities law in connection with (i) any registration statement contemplated by the Registration Rights Agreement and (ii) the filing of final Transaction Documents with the Commission and (b) to the extent such disclosure is required by law or Trading Market regulations, in which case the Company shall provide the Purchasers with prior notice of such disclosure permitted under this clause (b).

4.7     Shareholder Rights Plan.  No claim will be made or enforced by the Company or, with the consent of the Company, any other Person, that any Purchaser is an "Acquiring Person" under any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or similar anti-takeover plan or arrangement in effect or hereafter adopted by the Company, or that any Purchaser could be deemed to trigger the provisions of any such plan or arrangement, by virtue of receiving Securities under the Transaction Documents or under any other agreement between the Company and the Purchasers.

4.8     Non-Public Information.  Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, which shall be disclosed pursuant to Section 4.6, the Company covenants and agrees that neither it, nor any other Person acting on its behalf will provide any Purchaser or its agents or counsel with any information that constitutes, or the Company reasonably believes constitutes, material non-public information, unless prior

thereto such Purchaser shall have consented to the receipt of such information and agreed with the Company to keep such information confidential. The Company understands and confirms that each Purchaser shall be relying on the foregoing covenant in effecting transactions in securities of the Company. To the extent that the Company delivers any material, non-public information to a Purchaser without such Purchaser's consent, the Company hereby covenants and agrees that such Purchaser shall not have any duty of confidentiality to the Company, any of its Subsidiaries, or any of their respective officers, directors, agents, employees or Affiliates, or a duty to the Company, any of its Subsidiaries or any of their respective officers, directors, agents, employees or Affiliates not to trade on the basis of, such material, non-public information, provided that the Purchaser shall remain subject to applicable law. To the extent that any notice provided pursuant to any Transaction Document constitutes, or contains, material, non-public information regarding the Company or any Subsidiaries, the Company shall simultaneously file such notice with the Commission pursuant to a Current Report on Form 8-K. The Company understands and confirms that each Purchaser shall be relying on the foregoing covenant in effecting transactions in securities of the Company.

4.9     Use of Proceeds.  Except as set forth on Schedule 4.9 attached hereto, the Company shall use the net proceeds from the sale of the Securities hereunder for working capital purposes and shall not use such proceeds: (a) for the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices), (b) for the redemption of any Common Stock or Common Stock Equivalents, (c) for the settlement of any outstanding litigation or (d) in violation of FCPA or OFAC regulations.

4.10    Indemnification of Purchasers.  Subject to the provisions of this Section 4.10, the Company will indemnify and hold each Purchaser and its directors, officers, shareholders, members, partners, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls such Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "Purchaser Party") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents or (b) any action instituted against the Purchaser Parties in any capacity, or any of them or their respective Affiliates, by any stockholder of the Company who is not an Affiliate of such Purchaser Party, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is solely based upon a material breach of such Purchaser Party's representations, warranties or covenants under the Transaction Documents or any agreements or understandings such Purchaser Party may have with any such stockholder or any violations by such Purchaser Party of state or federal securities laws or any conduct by such Purchaser Party which is finally judicially determined to constitute fraud, gross negligence or willful misconduct). If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify

the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party.  Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel.  The Company will not be liable to any Purchaser Party under this Agreement (y) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed; or (z) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents.  The indemnification required by this Section 4.10 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or are incurred.  The indemnity agreements contained herein shall be in addition to any cause of action or similar right of any Purchaser Party against the Company or others and any liabilities the Company may be subject to pursuant to law.

    4.11   <u>Reservation and Listing of Securities</u>.

    (a)   The Company shall maintain a reserve of the Required Minimum from its duly authorized shares of Common Stock for issuance pursuant to the Transaction Documents in such amount as may then be required to fulfill its obligations in full under the Transaction Documents.

    (b)   If, on any date, the number of authorized but unissued (and otherwise unreserved) shares of Common Stock is less than the Required Minimum on such date, then the Board of Directors shall use commercially reasonable efforts to amend the Company's certificate or articles of incorporation to increase the number of authorized but unissued shares of Common Stock to at least the Required Minimum at such time, as soon as possible and in any event not later than the 75th day after such date.

    (c)   The Company shall, if applicable: (i) in the time and manner required by the principal Trading Market, prepare and file with such Trading Market an additional shares listing application covering a number of shares of Common Stock at least equal to the Required Minimum on the date of such application, (ii) take all steps necessary to cause such shares of Common Stock to be approved for listing or quotation on such Trading Market as soon as possible thereafter, (iii) provide to the Purchasers evidence of such listing or quotation and (iv) maintain the listing or quotation of such Common Stock on any date at least equal to the Required Minimum on such date on such Trading Market or another Trading Market. The Company agrees to maintain the eligibility of the Common Stock for electronic transfer through the Depository Trust Company or another established clearing corporation, including, without limitation, by timely payment of fees to the

Depository Trust Company or such other established clearing corporation in connection with such electronic transfer.

4.12 <u>Affiliate Transactions</u>.  Except as set forth on <u>Schedule 4.12</u>, from the date hereof until the 15-month anniversary thereof, the Company will not be a party to any transaction with any director, officer or stockholder or such associate or affiliate or relative) for the extension of credit, compensation or a consulting agreement that is not in accordance with past practice, or the facilitation of any sale or pledge against such affiliate's shares of Common Stock in contravention of any lock-up agreement entered into by such affiliate in connection with the sale of the Notes. Except as set forth on <u>Schedule 4.12</u>, the Company shall not, so long as the Purchaser owns any Notes, permit employee, officer, stockholder or director of the Company or any of its Subsidiaries or member of his or her immediate family is indebted to the Company or its Subsidiaries, as the case may be, to become indebted (or committed to make loans or extend or guarantee credit) to any of them, other than (i) for payment of salary for services rendered, (ii) reimbursement for reasonable expenses incurred on behalf of the Company, and (iii) for other standard employee benefits made generally available to all employees or executives (including stock option agreements outstanding under any stock option plan approved by the board of directors of the Company).   The Company will honor and use commercially reasonable efforts to cause its affiliates to honor all lock-up agreements entered into contemporaneously with this Agreement.

4.13 <u>Subsequent Equity Sales</u>.

(a)    From the date hereof until the 15-month anniversary thereof, if the Company or any Subsidiary, as applicable, sells or grants any option to purchase or sells or grants any right to reprice, or otherwise disposes of or issues (or announces any sale, grant or any option to purchase or other disposition), any Common Stock or Common Stock Equivalents entitling any Person (except as to any Person set forth on Schedule 4.13 hereto) to acquire shares of Common Stock at an effective price per share that is lower than the then Conversion Price or Exercise Price (such lower price, the "Base Price" and such issuances, collectively, a "<u>Dilutive Issuance</u>") (if the holder of the Common Stock or Common Stock Equivalents so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which are issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share that is lower than the Conversion Price or Exercise Price, such issuance shall be deemed to have occurred for less than the Conversion Price or Exercise Price on such date of the Dilutive Issuance), then the Conversion Price or Exercise Price shall be reduced to equal the Base Price.  Such adjustment shall be made whenever such Common Stock or Common Stock Equivalents are issued.  The Company shall notify the Purchaser in writing, no later than the Trading Day following the issuance of any Common Stock or Common Stock Equivalents subject to this Section 4.13(a), indicating therein the applicable issuance price, or applicable reset price, exchange price, conversion price and other pricing terms (such notice, the "<u>Dilutive Issuance Notice</u>").  For purposes of clarification, whether or not the Company provides a Dilutive Issuance Notice pursuant to this Section 4.13(a), upon the occurrence of any Dilutive Issuance, the Purchaser is entitled to receive a number of Conversion Shares or Warrant Shares based upon the Base Price on or after the date of

31

such Dilutive Issuance, regardless of whether the Purchaser accurately refers to the Base Price in the Notice of Conversion or Notice of Exercise.  For the avoidance of doubt, this Section 4.13(a) shall apply only so long as the Note has not been repaid

(b)     From the date hereof until the 15-month anniversary thereof, the Company shall be prohibited from effecting or entering into an agreement to effect any issuance by the Company or any of its Subsidiaries of Common Stock or Common Stock Equivalents (or a combination of units thereof) involving a Variable Rate Transaction. "Variable Rate Transaction" means a transaction in which the Company (i) issues or sells any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive, additional shares of Common Stock either (A) at a conversion price, exercise price or exchange rate or other price that is based upon, and/or varies with, the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock or (ii) enters into, or effects a transaction under, any agreement, including, but not limited to, an equity line of credit, whereby the Company may issue securities at a future determined price.  Any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages. For the avoidance of doubt, the 15-month sunset on this Section 4.13(b) shall apply only so long as the Note is not in default or has otherwise been repaid; provided, however, that in the event that the proceeds of such Variable Rate Transaction are being used in whole or in part to defease any remaining balance due on the Note, then this provision shall not operate to prevent such Variable Rate Transaction.

(c)     Notwithstanding the foregoing, this Section 4.13 shall not apply in respect of an Exempt Issuance, except that no Variable Rate Transaction shall be an Exempt Issuance.

4.14   Equal Treatment of Purchasers.  No consideration (including any modification of any Transaction Document) shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of the Transaction Documents unless the same consideration is also offered to all of the parties to such Transaction Documents. Further, the Company shall not make any payment of principal or interest on the Notes in amounts which are disproportionate to the respective principal amounts outstanding on the Notes at any applicable time.  For clarification purposes, this provision constitutes a separate right granted to each Purchaser by the Company and negotiated separately by each Purchaser, and is intended for the Company to treat the Purchasers as a class and shall not in any way be construed as the Purchasers acting in concert or as a group with respect to the purchase, disposition or voting of Securities or otherwise.

4.15   Certain Transactions and Confidentiality. Each Purchaser, severally and not jointly with the other Purchasers, covenants that neither it, nor any Affiliate acting on its behalf or pursuant to any understanding with it will execute any purchases or sales, including Short Sales, of any of the Company's securities during the period commencing with the execution of this

Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.6. Each Purchaser, severally and not jointly with the other Purchasers, covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company pursuant to the initial press release as described in Section 4.6, such Purchaser will maintain the confidentiality of the existence and terms of this transaction and the information included in the Disclosure Schedules.  Notwithstanding the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company expressly acknowledges and agrees that (i) no Purchaser makes any representation, warranty or covenant hereby that it will not engage in effecting transactions in any securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.6, (ii) no Purchaser shall be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.6 and (iii) no Purchaser shall have any duty of confidentiality or duty not to trade in the securities of the Company to the Company or its Subsidiaries after the issuance of the initial press release as described in Section 4.6.  Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.

4.16   Participation in Future Financing.

(a) From the date hereof until the date that is the twelfth (12)-month anniversary of the Effective Date, upon any issuance by the Company or any of its Subsidiaries of Common Shares, Common Shares Equivalents for cash consideration, Indebtedness or a combination of units thereof (a "Subsequent Financing"), the Qualified Purchasers shall, in the aggregate, have the right to participate in up to an amount of the Subsequent Financing equal to 35% of the amount of the Subsequent Financing (the "Participation Maximum") on the same terms, conditions and price provided for in the Subsequent Financing. A "Qualified Purchaser" is a Purchaser hereunder with a Subscription Amount of at least $500,000.

(b) Approximately four (4) Trading Days (or, in the case of a firm commitment underwritten public offering, approximately 12 hours) prior to the closing of the Subsequent Financing, the Company shall deliver to each Qualified Purchaser a written notice of its intention to effect a Subsequent Financing ("Pre-Notice"), which Pre-Notice shall ask such Qualified Purchaser if it wants to review the details of such financing (such additional notice, a "Subsequent Financing Notice"). Upon the request of a Qualified Purchaser, and only upon a request by such Qualified Purchaser, for a Subsequent Financing Notice, the Company shall promptly, but no later than one (1) Trading Day (or, in the case of a firm commitment underwritten public offering, approximately 12 hours prior) after such request, deliver a Subsequent Financing Notice to such Qualified Purchaser. The Subsequent Financing Notice shall describe in reasonable detail the proposed terms of such Subsequent Financing, the amount of proceeds intended to be raised

thereunder and the Person or Persons through or with whom such Subsequent Financing is proposed to be effected and shall include a term sheet or similar document relating thereto as an attachment.

(c) Any Qualified Purchaser desiring to participate in such Subsequent Financing must provide written notice to the Company by not later than 5:30 p.m. (New York City time) on the third (3rd) Trading Day (or, in the case of a firm commitment underwritten public offering, approximately 12 hours) after all of the Qualified Purchasers have received the Pre-Notice that the Qualified Purchaser is willing to participate in the Subsequent Financing, the amount of such Qualified Purchaser's participation, and representing and warranting that such Qualified Purchaser has such funds ready, willing, and available for investment on the terms set forth in the Subsequent Financing Notice. If the Company receives no such notice from a Qualified Purchaser as of such third (3rd) Trading Day (or, in the case of a firm commitment underwritten public offering, such 12 hours), such Qualified Purchaser shall be deemed to have notified the Company that it does not elect to participate.

(d) If by 5:30 p.m. (New York City time) on the third (3rd) Trading Day (or, in the case of a firm commitment underwritten public offering, after such 12 hour period) after all of the Qualified Purchasers have received the Pre-Notice, notifications by the Qualified Purchasers of their willingness to participate in the Subsequent Financing (or to cause their designees to participate) is, in the aggregate, less than the total amount of the Participation Maximum, then the Company may effect the remaining portion of such Participation Maximum on the terms and with the Persons set forth in the Subsequent Financing Notice.

(e) If by 5:30 p.m. (New York City time) on the third (3rd) Trading Day (or, in the case of a firm commitment underwritten public offering, after such 12 hour period) after all of the Qualified Purchasers have received the Pre-Notice, the Company receives responses to the Subsequent Financing Notice from Qualified Purchasers seeking to purchase more than the aggregate amount of the Participation Maximum, each such Qualified Purchaser shall have the right to purchase its Pro Rata Portion (as defined below) of the Participation Maximum. "Pro Rata Portion" means the ratio of (x) the Subscription Amount of Securities purchased on the Closing Date by a Qualified Purchaser participating under this Section 4.16 and (y) the sum of the aggregate Subscription Amounts of Securities purchased on the Closing Date by all Qualified Purchasers participating under this Section 4.16.

(f) The Company must provide the Qualified Purchasers with a second Subsequent Financing Notice, and the Qualified Purchasers will again have the right of participation set forth above in this Section 4.16, if Subsequent Financing subject to the initial Subsequent Financing Notice is not consummated for any reason on the terms set forth in such Subsequent Financing Notice within thirty (30) Trading Days after the date of the initial Subsequent Financing Notice.

(g) The Company and each Qualified Purchaser agree that if any Qualified Purchaser elects to participate in the Subsequent Financing, the transaction documents related to the Subsequent Financing shall not include any term or provision whereby such Qualified Purchaser shall be required to agree to any restrictions on trading as to any of the Securities purchased hereunder or be required to consent to any amendment to or termination of, or grant any waiver, release or the

like under or in connection with, this Agreement, without the prior written consent of such Qualified Purchaser.

(h) Notwithstanding anything to the contrary in this Section 4.16 and unless otherwise agreed to by such Qualified Purchaser, the Company shall either confirm in writing to such Qualified Purchaser that the transaction with respect to the Subsequent Financing has been abandoned or shall publicly disclose its intention to issue the securities in the Subsequent Financing, in either case in such a manner such that such Qualified Purchaser will not be in possession of any material, non-public information, by the sixth (6th) Business Day following delivery of the Subsequent Financing Notice. If by such sixth (6th) Business Day, no public disclosure regarding a transaction with respect to the Subsequent Financing has been made, and no notice regarding the abandonment of such transaction has been received by such Qualified Purchaser, such transaction shall be deemed to have been abandoned and such Qualified Purchaser shall not be deemed to be in possession of any material, non-public information with respect to the Company or any of its Subsidiaries.

4.17    Mandatory Redemption of Note upon Subsequent Financing. Notwithstanding the right of a Qualified Purchaser to participate in a Subsequent Financing pursuant to Section 4.16, if, at any time while the Note is outstanding, the Company shall effect a Subsequent Financing, the Purchaser shall have the right to require the Company to first use 50% of the net proceeds of such Subsequent Financing to redeem all or a portion of such Purchaser's Note for an amount in cash equal to the Mandatory Redemption Amount (as defined in the Note), which mandatory redemption terms and procedures shall be as set forth in the Note.

4.18    Exchange Transactions.   From the date hereof until the 15-month anniversary thereof, neither the Company nor any of its affiliates or Subsidiaries, nor any of its or their respective officers, employees, directors, agents or other representatives, will, without the prior written consent of the Purchaser (which consent may be withheld, delayed or conditioned in the Purchaser's sole discretion), directly or indirectly: (a) solicit, initiate, encourage or accept any other inquiries, proposals or offers from any Person (other than the Purchaser) relating to any exchange (i) of any security of the Company or any of its Subsidiaries for any other security of the Company or any of its Subsidiaries; or (ii) of any indebtedness or other securities of, or claim against, the Company or any of its Subsidiaries relying on the exemption provided by Section 3(a)(10) of the Securities Act (any such transaction described in clauses (i) or (ii), an "Exchange Transaction"); (b) enter into, effect, alter, amend, announce or recommend to its stockholders any Exchange Transaction with any Person (other than the Purchaser); or (c) participate in any discussions, conversations, negotiations or other communications with any Person (other than the Purchaser) regarding any Exchange Transaction, or furnish to any Person (other than the Purchaser) any information with respect to any Exchange Transaction, or otherwise cooperate in any way, assist or participate in, facilitate or encourage any effort or attempt by any Person (other than the Purchaser) to seek an Exchange Transaction involving the Company or any of its Subsidiaries. In addition, for so long as any of the Securities remain outstanding, neither the Company nor any of its affiliates or Subsidiaries, nor any of its or their respective officers, employees, directors, agents or other representatives, will, without the prior written consent of the Purchaser (which consent may be withheld, delayed or conditioned in the Purchaser's sole discretion), directly or indirectly, cooperate in any way, assist or participate in, facilitate or

encourage any effort or attempt by any Person (other than the Purchaser) to effect any acquisition of securities or indebtedness of, or claim against, the Company by such Person from an existing Purchaser of such securities, indebtedness or claim in connection with a proposed exchange of such securities or indebtedness of, or claim against, the Company (whether pursuant to Section 3(a)(9) or 3(a)(10) of the Securities Act or otherwise) (a "Third Party Exchange Transfer"). The Company, its affiliates and Subsidiaries, and each of its and their respective officers, employees, directors, agents or other representatives shall immediately cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with any Persons (other than the Purchaser) with respect to any of the foregoing. The Company shall promptly (and in no event later than 24 hours after receipt) notify (which notice shall be provided orally and in writing and shall identify the Person making the inquiry, request, proposal or offer and set forth the material terms thereof) the Purchaser after receipt of any inquiry, request, proposal or offer relating to any Exchange Transaction or Third Party Exchange Transfer, and shall promptly (and in no event later than 24 hours after receipt) provide copies to the Purchaser of any written inquiries, requests, proposals or offers relating thereto.  The Company agrees that it and its affiliates and Subsidiaries, and each of its and their respective officers, employees, directors, agents or other representatives Subsidiaries will not enter into any agreement with any Person subsequent to the date hereof which prohibits the Company from providing any information to the Purchaser in accordance with this provision.  For all purposes of this Agreement, violations of the restrictions set forth in this Section 3(h) by any Subsidiary or affiliate of the Company, or any officer, employee, director, agent or other representative of the Company or any of its Subsidiaries or affiliates shall be deemed a direct breach of this Section 4.18 by the Company.

4.19    Form D; Blue Sky Filings.  The Company agrees to timely file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof, promptly upon request of any Purchaser. The Company shall take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Purchasers at the Closing under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of such actions promptly upon request of any Purchaser.

## ARTICLE V.
## MISCELLANEOUS

5.1    Termination.  This Agreement may be terminated by any Purchaser, as to such Purchaser's obligations hereunder only and without any effect whatsoever on the obligations between the Company and the other Purchasers, by written notice to the other parties, if the Closing has not been consummated on or before the fifth (5th) Trading Day following the date hereof, provided, however, that no such termination will affect the right of any party to sue for any breach by any other party (or parties).

5.2    Fees and Expenses.  At the Closing, the Company has agreed to reimburse Dominion Capital LLC ("Dominion") the non-accountable sum of $25,000 for legal expenses plus all filing fees and expenses in connection with the Security Documents, none of which has been paid prior to the Closing.  Accordingly, in lieu of the foregoing payments, the aggregate amount that Dominion is to pay for the Securities at the Closing shall be reduced by $25,000 in lieu thereof.

The Company shall deliver to each Purchaser, prior to the Closing, a completed and executed copy of the Closing Statement, attached hereto as Annex A.  Except as expressly set forth in the Transaction Documents to the contrary, each party hereto shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement.  The Company shall pay all Transfer Agent fees (including, without limitation, any fees required for same-day processing of any instruction letter delivered by the Company and any conversion or exercise notice delivered by a Purchaser), stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchasers.

5.3    Entire Agreement.  The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

5.4    Notices.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of: (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number or email attachment at the email address as set forth on the signature pages attached hereto at or prior to 5:30 p.m. (New York City time) on a Trading Day, (b) the next Trading Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number or email attachment as set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (c) the second (2nd) Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (d) upon actual receipt by the party to whom such notice is required to be given.  The address for such notices and communications shall be as set forth on the signature pages attached hereto. To the extent that any notice provided pursuant to any Transaction Document constitutes, or contains, material, non-public information regarding the Company or any of the Subsidiaries, the Company shall simultaneously file such notice with the Commission pursuant to a Current Report on Form 8-K.

5.5    Amendments; Waivers.  No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Company and Purchasers which purchased at least 80% in interest of the Notes based on the initial Subscription Amounts hereunder or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought, provided that if any amendment, modification or waiver disproportionately and adversely impacts a Purchaser (or group of Purchasers), the consent of such disproportionately impacted Purchaser (or group of Purchasers) shall also be required.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right. Any proposed amendment or waiver that disproportionately, materially and adversely affects the rights and obligations of any Purchaser relative to the comparable rights and obligations of the other Purchasers shall require the prior written consent of such adversely affected Purchaser.

Any amendment effected in accordance with this Section 5.5 shall be binding upon each Purchaser and holder of Securities and the Company.

       5.6    <u>Headings</u>.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

       5.7    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Purchaser (other than by merger).  Any Purchaser may assign any or all of its rights under this Agreement to any Person to whom such Purchaser assigns or transfers any Securities, provided that such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions of the Transaction Documents that apply to the "Purchasers."

       5.8    <u>No Third-Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.10.

       5.9    <u>Governing Law</u>.  All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof.  Each party agrees that all legal Proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any Action or Proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such Action or Proceeding is improper or is an inconvenient venue for such Proceeding.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such Action or Proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.   If any party shall commence an Action or Proceeding to enforce any provisions of the Transaction Documents, then, in addition to the obligations of the Company under Section 4.10, the prevailing party in such Action or Proceeding shall be reimbursed by the non-prevailing party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such Action or Proceeding.

5.10    Survival.  The representations and warranties contained herein shall survive the Closing and the delivery of the Securities.

5.11    Execution.  This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to each other party, it being understood that the parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

5.12    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

5.13    Rescission and Withdrawal Right.  Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, whenever any Purchaser exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Purchaser may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights; provided, however, that, in the case of a rescission of a conversion of a Note or exercise of a Warrant, the applicable Purchaser shall be required to return any shares of Common Stock subject to any such rescinded conversion or exercise notice concurrently with the return to such Purchaser of the aggregate exercise price paid to the Company for such shares and the restoration of such Purchaser's right to acquire such shares pursuant to such Purchaser's Warrant (including, issuance of a replacement warrant certificate evidencing such restored right).

5.14    Replacement of Securities.  If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction. The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

5.15    Remedies.  In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be

entitled to specific performance under the Transaction Documents.  The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any Action for specific performance of any such obligation the defense that a remedy at law would be adequate.

5.16    Payment Set Aside. To the extent that the Company makes a payment or payments to any Purchaser pursuant to any Transaction Document or a Purchaser enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

5.17    Usury.  To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any Action or Proceeding that may be brought by any Purchaser in order to enforce any right or remedy under any Transaction Document.  Notwithstanding any provision to the contrary contained in any Transaction Document, it is expressly agreed and provided that the total liability of the Company under the Transaction Documents for payments in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums in the nature of interest that the Company may be obligated to pay under the Transaction Documents exceed such Maximum Rate.  It is agreed that if the maximum contract rate of interest allowed by law and applicable to the Transaction Documents is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to the Transaction Documents from the effective date thereof forward, unless such application is precluded by applicable law.  If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to any Purchaser with respect to indebtedness evidenced by the Transaction Documents, such excess shall be applied by such Purchaser to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at such Purchaser's election.

5.18    [Reserved].

5.19    Liquidated Damages.  The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

5.20     Saturdays, Sundays, Holidays, etc.     If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

5.21     Construction. The parties agree that each of them and/or their respective counsel have reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments thereto. In addition, each and every reference to share prices and shares of Common Stock in any Transaction Document shall be subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

5.22     **WAIVER OF JURY TRIAL.  IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**AVALANCHE INTERNATIONAL, CORP.**                    Address for Notice:

By: _____                 Email:  PMansour@alzamend.com
     Name: Philip Mansour                          Fax:
     Title:  Chief Executive Officer

With a copy to (which shall not constitute notice):
Sichenzia Ross Ference LLP
1185 Avenue of the Americas, 37th Floor
New York, NY 10036
Telephone: (212) 930-9700
Attn.: Marc J. Ross


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]

42

[PURCHASER SIGNATURE PAGES TO SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: Dominion Capital LLC

*Signature of Authorized Signatory of Purchaser*: _____

Name of Authorized Signatory: Mikhail Gurevich

Title of Authorized Signatory: Managing Member

Email Address of Authorized Signatory: mikhail@domcapllc.com

Facsimile Number of Authorized Signatory: _____

Address for Notice to Purchaser:

256 W 38th St 15th Floor, New York, NY 10018


Address for Delivery of Securities to Purchaser (if not same as address for notice):




Subscription Amount: $ 2,750,000

Warrant Shares: 1,617,647

EIN Number: __45-2571126_____


[SIGNATURE PAGES CONTINUE]

**SCHEDULE OF PURCHASERS**

| (1)<br>Buyer | (2)<br>Principal Amount of<br>Convertible Notes | (3)<br>Warrants |
| --- | --- | --- |
| | | 1,617,647 |
| Dominion Capital LLC | $2,750,000 | |

**Annex A**

## CLOSING STATEMENT

Pursuant to the attached Securities Purchase Agreement, dated as of April 11, 2019, the Purchaser shall purchase $2,750,000 principal amount of Notes from Avalanche International Corp., a Nevada corporation (the "Company"), for a total purchase price of $2,750,000. All funds will be wired to the attorney escrow account of counsel for the Company and disbursed in accordance with this Closing Statement.

**Disbursement Date:** April 11, 2019

_____

PURCHASE PRICE

|  | **Gross Proceeds to be Received** | $2,750,000 |
|---|---|---|

**I.   DISBURSEMENTS**

| DPW Holdings, Inc. | $ 2,676,219.51 |
|---|---|
|  | On behalf of MTIX Ltd. towards outstanding invoices |
| Robinson Brog | $     25,000.00 |
| Sichenzia Ross Ference LLP | $     48,780.49 |

**ARTICLE VI.Total Amount Disbursed: $2,750,000**

**AVALANCHE INTERNATIONAL, CORP.**


By:_____
      Name: Phil Mansour
       Title: Chief Executive Officer

**DOMINION CAPITAL LLC**


By:_____
      Name:
       Title:

**WIRE INFO:**

**Sichenzia Ross Ference LLP**

Citibank
153 East 53rd Street
23rd Floor
New York, NY  10022

A/C of Sichenzia Ross Ference LLP
A/C#:          6780076598
ABA#:           021000089

**DPW Holdings, Inc.**

Farmers & Merchants Bank of Long Beach
2421 East Coast Highway
Corona Del Mar, CA 92625

Routing/ABA: 122201198

Account Number: 26007096
Account Name: DPW Holdings, Inc.

**Robinson Brog**

Bank Name and Address:    Wells Fargo Bank, N.A.
                          150 East 42ndStreet, 35th Fl.
                          New York, NY  10017

Account Name:              Robinson Brog Leinwand Greene Genovese & Gluck P.C.

Account Address:           875 Third Avenue,  Fl. 9
                           New York, NY 10022

Account Number:           2000042283692

Routing#:                  121000248

# DISCLOSURE SCHEDULES TO THE

# SECURITIES PURCHASE AGREEMENT

# BY AND AMONG

# AVALANCHE INTERNATIONAL, CORP. AND EACH OF THE PURCHASERS SIGNATORY THERETO

# DATED APRIL 11, 2019

These Sections (these "**Sections**") of this Disclosure Schedule are numbered to correspond to the corresponding sections of the Securities Purchase Agreement (the "**Agreement**").  These Sections have been prepared in accordance with, and subject to, the following terms and conditions:

(a)      To the extent a Section is intended to qualify a representation or warranty of the Company contained in the Article III of the Agreement, the information and disclosures contained in such Section are intended only to qualify and limit such representation or warranty and not in any way expand the scope or effect of such representation or warranty.

(b)      The disclosure of any item in any Section of this Disclosure Schedule will constitute disclosure for purposes of another Section if it is reasonably clear from a reading of the disclosure that such disclosure is applicable to such other Sections or Sub-Sections.

(c)      Inclusion of any item in a Section of this Disclosure Schedule does not constitute a determination by the Company that such item is material and shall not be deemed to establish a standard or materiality. No disclosure in any Section of this Disclosure Schedule relating to any possible breach or violation of any agreement, law or any potential adverse contingency shall be construed as an admission or indication that any such breach or violation exists or has actually occurred or that such adverse contingency will actually occur.

(d)      Any capitalized terms not defined in this Disclosure Schedule shall have the meanings assigned thereto in the Agreement.  Any section headings or titles used herein are included for convenience only and shall not be considered as representations or warranties as to the type, character or content of the matters referred to thereunder.

**SCHEDULE 3.1(a)**

<u>**SUBSIDIARIES OF THE COMPANY**</u>

1. MTIX Limited, a company formed under the laws of England and Wales

2. Restaurant Capital Group, LLC, a California limited liability company

3. Smith and Ramsey Brands, LLC, a Nevada limited liability company (discontinued in June 2015; current status: revoked)

All Liens of the Company and its Subsidiaries are set forth in Schedules B and C of the Disclosure Schedules to the Security Agreement.

SCHEDULE 3.1(g)

**Capitalization**

The capitalization of the Company as of April 10, 2019, is as set forth in the following table:

| STOCKHOLDER | Common Stock | Class A Preferred | Class B Preferred | Stock Options # of Options Granted | Warrants # of Warrants | Convertible Debt # of Shares | Fully Diluted Shares Outstanding | Ownership Interest |
|---|---|---|---|---|---|---|---|---|
| PHILOU VENTURES, LLC | 214,000 | 50,000 | | | 5,000,000 | | 7,214,000 | 10.37% |
| PHILIP E. MANSOUR | 250,000 | | | 1,000,000 | | | 1,250,000 | 1.80% |
| MILTON C. AULT, III | | | | 1,000,000 | | | 1,000,000 | 1.44% |
| WILLIAM B. HORNE | | | | 1,000,000 | | | 1,000,000 | 1.44% |
| MTIX Founders | | | 100,000 | | | 20,582,889 | 20,682,889 | 29.72% |
| DIGITAL POWER CORP. | 861,624 | | | | 14,908,794 | 14,908,794 | 30,679,212 | 44.09% |
| OTHERS | 4,203,576 | | | 531,919 | 100,000 | 2,920,068 | 7,755,563 | 11.15% |
| TOTALS: | 5,529,200 | 50,000 | 100,000 | 3,531,919 | 20,008,794 | 38,411,750 | 69,581,663 | 100.00% |

A total of 61,826,101 shares of common stock are owned beneficially, and of record, by Affiliates of the Company as of the date hereof. The beneficial ownership assumes a cash exercise of warrants to purchase 20,008,794 shares of the Company's common stock and the issuance of 35,491,683 shares of common stock upon the conversion of outstanding principal and interest. The Company is authorized to issue 75,000,000 shares of common stock. The Company shall maintain a reserve from its duly authorized shares of common stock for issuance of the Underlying Shares at least in an amount equal to the Required Minimum pursuant to the Transaction Documents.

Outstanding securities, which are convertible into Common Stock, consisted of the following at April 10, 2019:

| | |
|---|---|
| Stock options | 3,531,919 |
| Warrants | 20,008,794 |
| Convertible notes | 38,411,750 |
| Conversion of preferred stock | 2,000,000 |
| Total | 63,952,463 |

**Unregistered sales of equity securities as of the filing date of the Company's Quarterly Report on Form 10-Q for the period ended August 31, 2016:**

Unless stated otherwise, the following securities were sold and issued in reliance upon the exemption provided by Section 4(a)(2) of the Securities Act of 1933, as amended (the "**Securities Act**"), and the safe harbor of Rule 506 promulgated thereunder.

On December 2, 2015, the Company issued 100,000 warrants to a third party in connection with a loan to the Company. The warrants were valued at $30,987 and were expensed at the time of issuance as non-cash interest expense using the effective interest method.

On December 10, 2015, the Company issued and sold to an accredited investor 25,000 shares of its common stock. This issuance resulted in aggregate gross proceeds, which were used for general operating expenses, to the Company of $5,000.

On January 26, 2016, the Company issued 50,000 shares of its common stock as payment for services to a third party for consulting services. The shares were valued at $20,000, an average of $0.40 per share.

During January 2016, the Company issued an aggregate of 457,619 shares of its common stock as payment for principal and accrued interest. The shares were valued at $183,048, an average of $0.40 per share.

On February 28, 2017, the Company issued 250,000 shares of its common stock as payment for services to an officer. The shares were valued at $40,000 at $0.16 per share.

On March 9, 2017, the Company issued an aggregate of 216,946 shares of its common stock as payment for principal and accrued interest. The shares were valued at $32,542, an average of $0.15 per share.

On April 26, 2017, pursuant to the terms of an Exchange Agreement entered on March 7, 2017, between the Company and Philou Ventures, LLC ("**Philou**"), the Company issued to Philou 50,000 shares of its newly created Class A Convertible Preferred Stock (the "**Class A Shares**") in exchange for the surrender by Philou of 2,000,000 shares of its common stock. These Class A Shares were issued in reliance upon the exemption provided by Section 3(a)(9) of the Securities Act.

On January 23, 2018, the Company issued an aggregate of 200,000 shares of its common stock as payment for principal. The shares were valued at $280,000, an average of $1.40 per share.

On May 11, 2018, the Company issued an aggregate of 20,000 shares of its common stock as repayment of principal. The shares were valued at $4,550, an average of $0.23 per share.

SCHEDULE 3.1(i)

**Material Changes; Undisclosed Events, Liabilities or Developments**

The Company has not issued any equity securities to any officer, director or Affiliate, except as otherwise set forth in Schedule 3.1(g) or pursuant to existing Company stock option plans.

***Material Subsequent Events since August 31, 2016***

(a)      On August 22, 2017, pursuant to the terms of a Share Exchange Agreement dated as of March 3, 2017, and as amended on July 13, 2017 and August 21, 2017 (the "**Exchange Agreement**") with MTIX Limited, a company formed under the laws of England and Wales ("**MTIX**") and the three (3) shareholders of MTIX (the "**Sellers**"), the Company completed its acquisition of MTIX. Upon the terms and subject to the conditions set forth in the Exchange Agreement, the Company acquired MTIX from the Sellers through the transfer of all issued and outstanding ordinary shares of MTIX (the "**MTIX Shares**") by the Sellers to the Company in exchange (the "**Exchange**") for the issuance by the Company of: (a) 7% secured convertible promissory notes (individually, a "No**t**e" and collectively, the "**Notes**") in the aggregate principal face amount of $9,500,000 to the Sellers in pro rata amounts commensurate with their current respective ownership percentages of MTIX's ordinary shares, (b) (i) $500,000 in cash, $50,000 of which was paid on October 26, 2016, and (ii) 100,000 shares of the Company's newly designated shares of the Company's Class B Convertible Preferred Stock (the "**Class B Shares**") to the principal shareholder of MTIX (the "**Majority Shareholder**").

(b)      On December 5, 2017, DPW Holdings, Inc., a Delaware corporation ("**DPW**"), entered into an exchange agreement with WT Johnson & Sons (Huddersfield) Limited (the "**WT Johnson**"), pursuant to which the Company issued to the WT Johnson, (a) a convertible promissory note in the principal amount of $600,000 ("**Note A**") and (b) a convertible promissory note in the principal amount of $1,667,766 ("**Note B**"), in exchange for cancellation of (i) an outstanding loan made by WT Johnson to MTIX in the amount of $265,666; and (ii) cancellation of an aggregate of $2,002,500 owed by MTIX to WT Johnson pursuant to an Agreement for the Sale and Purchase of a Textile Multi-Laser Enhancement Technology Machine dated as of July 21, 2017 by and between MTIX and WT Johnson.

Note A was convertible into DPW's common stock at a conversion price of $1.00 per share, does not bear interest, and matured two years from issuance. Note B was convertible into DPW's common stock at a conversion price of $0.85 per share, does not bear interest, and matured two years from issuance. However, WT Johnson did not have the right to convert any portion of Note B, following receipt by WT Johnson of an aggregate of $2,267,766 of gross proceeds from the sale of shares of common stock issued upon conversion of Note A or Note B.

During December 2017, DPW issued 600,000 shares of its common stock upon the conversion of Note A and WT Johnson notified DPW that gross proceeds during the month of December 2017 from sales of the 600,000 shares of common stock were sufficient to satisfy the entire $2,267,766 obligation. As a result of entering into the exchange agreement with WT Johnson, MTIX is obligated to pay DPW $2,668,266, consisting of the amount of the exchange agreement of $2,267,766 and a value added tax of $400,500 from the sale of the Textile Multi-Laser Enhancement Technology Machine. Concurrent with

entering into the exchange agreement, MTIX issued a promissory note in the amount of $2,668,266 to DPW and Note B was cancelled.

***Convertible Notes Payable since August 31, 2016***

(a)      On October 5, 2016, November 30, 2016, and February 22, 2017, the Company entered into three convertible promissory notes with DPW Holdings, Inc. (NYSE: DPW) (the "**DPW Notes**"), a related party. Under the terms of the DPW Notes, the Company borrowed the sum of $1,575,000. The DPW Notes featured an original issue discount of $75,000, resulting in net funding to the Company of $1,500,000. The DPW Notes were due in two years and accrued interest at 12% per annum. The DPW Notes, were convertible into shares of the Company's common stock at a conversion price of $0.745 per share.

On September 6, 2017, DPW Holdings, Inc. and the Company entered into a Loan and Security Agreement (the "**Loan Agreement**") with an effective date of August 21, 2017, pursuant to which DPW will provide the Company a non-revolving credit facility of up to $10,000,000, for a period ending on August 21, 2019.

In consideration of entering into the Loan Agreement, the DPW Notes were cancelled and the DPW Notes were consolidated and a new Convertible Promissory Note was issued (the "**New DPW Note**"). At March 31, 2018, DPW has provided loans to the Company in the principal amount $7,454,397 and, in addition to the 12% convertible promissory notes, the Company has issued to DPW warrants to purchase 14,908,794 shares of the Company's common stock. The New DPW Note is due in two years and accrues interest at 12% per annum on the face amount. The New DPW Note contains standard events of defaults. Future advances under the Loan Agreement, if any, will be evidenced by a convertible promissory containing a conversion price feature at $0.50 per share and warrant with an exercise price of $0.50 per share. Further, under the terms of the Loan Agreement, the New DPW Notes are secured by the assets of the Company.

(b)      The Gary Gelbfish convertible note payable was due and payable six months after its issuance date of March 27, 2015 with interest at 10% per annum. If this note was not paid at maturity, at the election of the holder, outstanding principal and accrued but unpaid interest under the note was convertible into shares of the Company's common stock at a conversion price per share equal to lesser of: (i) fifty percent (50%) discount to the average closing price for the twenty (20) consecutive trading days immediately preceding the maturity date or (ii) $0.50 per share. The note was not repaid on the maturity date of September 23, 2015 and as such was in default as of August 31, 2016 and remains in default as of April 11, 2019. As of April 10, 2019, there were 305,419 shares issuable upon conversion of this note.

(b)      The JMJ Financial convertible note payable is due and payable 24 months after its issuance date of April 29, 2015 with interest at 12% per annum. At the election of the holder, outstanding principal and accrued but unpaid interest under the notes are convertible into shares of the Company's common stock at any time prior to maturity at a conversion price per share equal to a forty percent (40%) discount to the lowest trading price for the twenty-five (25) consecutive trading days immediately preceding the notice of conversion. As of April 10, 2019, there were 112,963 shares issuable upon conversion of this note. Between May 2018 and July 2018, the Company made principal payments of $35,000 on this note and the remaining principal balance of $25,500 is in default as of April 11, 2019.

(c)       The Black Mountain Equities, Inc. convertible note payable is due and payable 12 months after its issuance date of June 4, 2015 with interest at 10% per annum. At the election of the holder, outstanding principal and accrued but unpaid interest under the note is convertible into shares of the Company's common stock at any time prior to maturity at a conversion price per share equal to the lesser of: (i) forty percent (40%) discount to the lowest trading price for the twenty-five (25) consecutive trading days immediately preceding the notice of conversion or (ii) $1.06 per share. As of April 10, 2019, there were 135,460 shares issuable upon conversion of this note. The Note was not repaid on the maturity date of June 4, 2016 and remains in default as of April 11, 2019.

(d)       The LG Capital Funding, LLC convertible note payable was due and payable 13 months after its issuance date of November 3, 2014 with interest at 8% per annum. At the election of the holder, outstanding principal and accrued but unpaid interest under the note were convertible into shares of the Company's common stock, at any time after 180 days from the date of issuance, at a conversion price per share equal to a forty percent (40%) discount to the lowest trading price for the twenty (20) consecutive trading days immediately preceding the notice of conversion. In January, 2016, the note was amended to grant LG Capital 75,000 warrants with an exercise price of $0.30 per share, and to permit the Company to re-pay the LG Capital Note with a pre-payment penalty of 120%. The fair value of the warrants amounted to $26,250, which was expensed at the time of issuance due to the short-term nature of the note. The note was not repaid on the maturity date and as such is in default as of August 31, 2016 and as of April 11, 2019. Upon default, the note accrues interest at 24% per annum. As of April 10, 2019, there were 157,407 shares issuable upon conversion of this note.

(e)       The Lord Abstract, LLC convertible note payable is due and payable 12 months after its issuance date of June 30, 2015 with interest at 10% per annum. At the election of the holder, outstanding principal and accrued but unpaid interest under the note are convertible into shares of the Company's common stock, at any time after 30 days from the date of issuance, at a conversion price per share equal to a forty percent (40%) discount to the lowest closing price for the twenty (20) consecutive trading days immediately preceding the notice of conversion. If this note is not paid at maturity, then the interest rate shall increase to 24% thereafter. As of April 10, 2019, there were 4,815 shares issuable upon conversion of this note. Between June 2016 and August 2016, the Company made payments of $7,500 on this note and the remaining principal balance of $1,300 remains in default as of April 10, 2019.

(f)       The JLA Realty convertible note payable is due and payable 36 months after proceeds have been received by the Company, which occurred between April 25, 2016 and August 8, 2016 with interest at 12% per annum. At the election of the holder, outstanding principal and accrued but unpaid interest under the note is convertible into shares of the Company's common stock at any time prior to maturity at a fixed price per share equal to $0.15. In connection with the issuance of the JLA Realty note described above, the Company recognized a debt discount of $89,087 and an excess interest of $7,614 during the three months ended August 31, 2016, which represents the excess of the fair value of the bifurcated conversion option of approximately $58,000 over the principal amount of convertible debt issued.  The fair value of the conversion feature is separately measured at fair value, with changes in fair value recognized in operations.  During the three and nine months ended August 31, 2016, the Company recognized interest expense of $20,599 and $24,750, respectively, resulting from amortization of the debt discount for the JLA Realty note. As of August 31, 2016, the conversion option has a fair value of $247,527 and is presented on a combined basis with the related loan host in the Company's Condensed

Consolidated Balance Sheet at August 31, 2016. As of April 10, 2019, there were 2,170,667 shares issuable upon conversion of this note.

(g)     Other convertible notes payable are due and payable 36 months after issuance with interest at 10% per annum. At the election of the holder, outstanding principal and accrued but unpaid interest under the note are convertible into shares of the Company's common stock, at any time after six months from the date of issuance, at a conversion price per share equal the lesser of: (i) fifty percent (50%) discount to the volume weighted average price over the twenty (20) consecutive trading days immediately preceding the notice of conversion. As of April 10, 2019, there were 33,336 shares issuable upon conversion of these notes.

### *Promissory Notes Payable since August 31, 2016*

(a)     On October 8, 2015, the Company entered into a promissory note agreement with Studio Capital, LLC, ("**Studio Capital**") for an aggregate principal amount of $125,000 (the "**Studio Capital Note**"). The Studio Capital Note carries an original issue discount of $25,000, provided for a loan fee of 5,000 shares of the Company's common stock and had a maturity date of April 8, 2016. The Studio Capital Note was not repaid on December 19, 2017.

(b)     On March 17, 2015, the Company entered into a promissory note agreement with Strategic, IR, Inc. ("**Strategic**") for an aggregate principal amount of $12,500 (the "**Strategic Note**"). The Strategic Note included a $1,750 loan fee, accrued interest at 10% and had a maturity date of April 16, 2015. The Strategic Note was repaid on March 6, 2018.

(c)     On December 2, 2015, the Company entered into a promissory note agreement (the "**Livingston Note**") with a third party for an aggregate principal amount of $125,000. The Livingston Note carries an original issue discount of $25,000. As additional consideration to the investor, the Company agreed to issue a warrant to purchase up to 100,000 shares of the Company's common stock at a price of $0.01 per share. The Company recorded debt discount in the amount of $30,987 based on the fair value of the warrants. The Livingston Note was repaid on January 24, 2018.

(d)     On April 7, 2016 and September 14, 2016, Restaurant Capital Group, LLC, a subsidiary of the Company, entered into promissory note agreements with JLA Realty (the "**JLA Notes**") for an aggregate amount of $480,000. The JLA Notes accrue interest at 16% per annum and have maturity dates of October 4, 2016 and March 14, 2017 and carry an original issue discount of $125,000. Between November 2016 and December 2016, the Company made payments of $150,000 on the JLA Notes and the remaining principal balance of $330,000 remains in default as of April 10, 2019.

**SCHEDULE 3.1(o)**

**Title to Assets**

(a)     Under the terms of the Loan Agreement with DPW, the New DPW Notes are secured by the assets of the Company.

(b)     Pursuant to the terms of Exchange Agreement with MTIX, the Company issued 7% secured convertible promissory notes in the aggregate principal face amount of $9,500,000 to the Sellers in pro rata amounts commensurate with their current respective ownership percentages of MTIX's ordinary shares. The Notes are secured, pursuant to a Security Agreement, by a lien on certain of the Company's assets, including but not limited to the intellectual property of MTIX.

SCHEDULE 3.1(r)

**Transactions with Affiliates and Employees**

(a)      On December 5, 2017, DPW Holdings, Inc., a Delaware corporation ("**DPW**"), entered into an exchange agreement with WT Johnson & Sons (Huddersfield) Limited (the "**WT Johnson**"), pursuant to which the Company issued to the WT Johnson, (a) a convertible promissory note in the principal amount of $600,000 ("**Note A**"), and (b) a convertible promissory note in the principal amount of $1,667,766 ("**Note B**"), in exchange for cancellation of (i) an outstanding loan made by WT Johnson to MTIX in the amount of $265,666; and (ii) cancellation of an aggregate of $2,002,500 owed by MTIX to WT Johnson pursuant to an Agreement for the Sale and Purchase of a Textile Multi-Laser Enhancement Technology Machine dated as of July 21, 2017 by and between MTIX and WT Johnson.

Note A was convertible into DPW's common stock at a conversion price of $1.00 per share, does not bear interest, and matured two years from issuance. Note B was convertible into DPW's common stock at a conversion price of $0.85 per share, does not bear interest, and matured two years from issuance. However, WT Johnson did not have the right to convert any portion of Note B, following receipt by WT Johnson of an aggregate of $2,267,766 of gross proceeds from the sale of shares of common stock issued upon conversion of Note A or Note B.

During December 2017, DPW issued 600,000 shares of its common stock upon the conversion of Note A and WT Johnson notified DPW that gross proceeds during the month of December 2017 from sales of the 600,000 shares of common stock were sufficient to satisfy the entire $2,267,766 obligation. As a result of entering into the exchange agreement with WT Johnson, MTIX is obligated to pay DPW $2,668,266, consisting of the amount of the exchange agreement of $2,267,766 and a value added tax of $400,500 from the sale of the Textile Multi-Laser Enhancement Technology Machine. Concurrent with entering into the exchange agreement, MTIX issued a promissory note in the amount of $2,668,266 to DPW and Note B was cancelled.

(b)      On October 5, 2016, November 30, 2016, and February 22, 2017, the Company entered into three convertible promissory notes with DPW (the "**DPW Notes**"), a related party. Under the terms of the DPW Notes, the Company borrowed the sum of $1,575,000. The DPW Notes featured an original issue discount of $75,000, resulting in net funding to the Company of $1,500,000. The DPW Notes were due in two years and accrued interest at 12% per annum. The DPW Notes, were convertible into shares of the Company's common stock at a conversion price of $0.745 per share.

On September 6, 2017, DPW and the Company entered into a Loan and Security Agreement (the "**Loan Agreement**") with an effective date of August 21, 2017, pursuant to which DPW will provide the Company a non-revolving credit facility of up to $10,000,000, for a period ending on August 21, 2019.

In consideration of entering into the Loan Agreement, the DPW Notes were cancelled and the DPW Notes were consolidated and a new Convertible Promissory Note was issued (the "**New DPW Note**"). At December 3, 2018, DPW has provided loans to the Company in the principal amount $6,795,346 and, in addition to the 12% convertible promissory notes, the Company has issued to DPW warrants to purchase 13,590,692 shares of the Company's common stock. The New DPW Note is due in two years and accrues interest at 12% per annum on the face amount. The New DPW Note contains standard events of defaults. Future advances under the Loan Agreement, if any, will be evidenced by a

convertible promissory containing a conversion price feature at $0.50 per share and warrant with an exercise price of $0.50 per share. Further, under the terms of the Loan Agreement, the New DPW Notes are secured by the assets of the Company.

Milton C. Ault, III, is the Chief Executive Officer and Chairman of the Board of Directors of DPW's Board of Directors and the Chairman of the Company's Board of Directors. William B. Horne is the Chief Financial Officer and a director of DPW and the Chief Financial Officer and a director of the Company.

**SCHEDULE 3.1(w)**

### **Registration Rights**

The Company's existing holders have agreed to waive any and all registration rights granted by the Company until the Company's obligations to the Purchasers under that certain Registration Rights Agreement of even date herewith by and among the Company and the Purchasers dated April 11, 2019, have been satisfied in full.

**SCHEDULE 3.1(bb)**

## Solvency

| | | |
|---|---|---|
| MTIX Founders | $ | 9,262,300 |
| DPW Holdings, Inc. | $ | 7,454,397 |
| JLA Realty, LLC | $ | 325,600 |
| G. Gelbfish | $ | 87,808 |
| Black Mountain Equities | $ | 42,670 |
| LG Capital Funding, LLC | $ | 42,500 |
| GCEF Oppurtunity Fund | $ | 27,500 |
| JMJ Financial | $ | 25,500 |
| Others | $ | 11,000 |
| | $ | 17,279,275 |

**SCHEDULE 3.1(ff)**

## **Accountants**

Marcum LLP

**SCHEDULE 3.1(vv)**

## **Payments of Cash**

None.

**SCHEDULE 4.9**

### Use of Proceeds

$ 2,676,219.51 of the proceeds will be used to pay DPW Holdings, Inc., amounts owed under various outstanding invoices.

The remainder will be used for expenses of the Offering.

**SCHEDULE 4.12**

## **<u>Affiliate Transactions</u>**

The Company is planning to issue up to $25,000,000 in preferred stock to Ault & Company, Inc., an entity controlled by director Milton C. Ault, III.

**SCHEDULE 4.13**

**<u>Subsequent Equity Sales</u>**

Ault & Company, Inc., a Delaware corporation